UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America_____
                                              )          Crim. No. 06-0026-02 (CKK)
                                              )
            versus                            )
                                              )
LATANYA ANDREWS,                              )
_____Defendant_____ )

**MOTION FOR DIRECTED VERDICT PURSUANT
TO F.R.Crim.P. 29(b) and (c)**

Defendant Latanya Andrews, through undersigned counsel, respectfully presents

this memorandum in support of her previous motion for judgment of acquittal ("MJOA"),

made at the close of the government's case-in-chief and renewed at the close of the case

itself.  Defendant reiterates her motion that the Court grant a judgment of acquittal on

Count I—Conspiracy, in violation of Title 18 U.S.C. §371—and Count II, Bribery, in

violation of Title 18 U.S.C. §18.

### I.  The Legal Standard

1.  Defendant hereby incorporates by reference the statement of the "Controlling

Legal Standards," set forth in Part II, ¶¶1-3, pages 2-4 of  "Defendant Peter Turner's

Motion for Judgment of Acquittal Pursuant to F.R.Crim.P. 29 (b) and (c)," previously

filed September 10, 2006 (Document No. 59, ECF – Docket of case).  Defendant

Andrews submits that it is an accurate and comprehensive statement of the law which this

Court must apply to determining whether it should grant an MJOA.

2.   According to *United States v. Larry Campbell*, No. 81-1757 (March 15, 1983)[1], a court "must view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences.  A verdict will be overruled if only if no reasonable juror could accept the evidence as sufficient to support the conclusions of a defendant's guilt beyond a reasonable doubt." *See United States v. Staten,* 189 U.S.App.DC 100, 581 F.2d 878, 882 (D.C. Cir. 1978); *Curley v. United States,* 81 U.S.App.DC 389, 160 F.2d 229 (D.C. Cir.), <u>cert. denied</u>, 331 U.S. 837 (1947).  The Campbell jury found defendant Larry guilty of bribery in connection with the move of household belongings of Judge Robert Campbell (no relation to defendant), then an associate judge of the D.C. Superior Court.  The appeals court found there was evidence that defendant profited from a corporate bribery scheme (which involved illegally fixing more than 1,100 parking tickets on behalf of a construction company) but no evidence that he took part in that scheme.[2]  The court further observed,

> Evidence might raise a question in a reasonable man's mind.  But that is not enough.  Guilt must be established beyond a reasonable doubt.  And, unless that result is possible on the evidence, the judge must not let the jury act, he must not let it act on what would necessarily be only surmise and conjecture, without evidence. *Cooper v. United States,* 94 U.S.App.DC 343, 218 F.2d 39, 42 (D.C. Cir. 1954).

## II.  The Evidence the Government Presented Against Defendant Andrews

The government's contentions were as follows:

---

[1] Counsel relies on Versuslaw, an online research service.  Versuslaw, though accurate, occasionally fails to include complete citations to the Federal Reporter.  Defendant will supplement this pleading with a list of citations to the proper authority.

[2] Defendant and his codefendants were found not guilty of all other counts in the indictment.

Vestor Mayo was an employee of the Veterans Affairs Medical Center ("VAMC"). She had a romantic relationship with Peter Turner. As an federal employee, Ms. Mayo participated in the Federal Employees Group Life Insurance program ("FEGLI"). After Ms. Mayo's death on Dec. 22, 2000, Mr. Turner obtained by fraud benefits under Ms. Mayo's FEGLI policy. He did so by forging, or having another person forge, Vestor Mayo's signature on a FEGLI Designation of Beneficiary ("DOB") form. The DOB also contained the forged signature of James Lebron, a human resource specialist for the Veterans Affairs Medical Center ("VAMC"). The fraudulently prepared DOB permitted Mr. Turner to obtain $20,500.00 in FEGLI benefits, one-half of those paid under the policy. Mr. Turner had a friendship or association with defendant Andrews, who worked as a payroll technician at the VAMC in offices that adjoined those of the human resource section. Ms. Andrews's job as a payroll technician gave her access to human resource section in which personnel files were stored. This access permitted Ms. Andrews to "cause" the tainted form to be placed in the personnel file of Vestor Mayo. It was then used to support the improper payment of funds to Mr. Turner after made his claim. Mr. Turner paid Ms. Andrews of $1,000.00 for her services. This payment was a bribe because Ms. Andrews, as an employee of the United States, was a public official.

The government presented its case through documents and other physical exhibits and through the testimony of witnesses.

Defendant concedes that the government presented sufficient evidence to establish: that Vestor Mayo and Peter Turner had a romantic relationship; that the signature of Vestor Mayo on the designation form was a forgery; that the signature of

James Lebron, too, was forged; that Mr. Turner obtained $20,500.00 in benefits from the Mayo FEGLI policy; that Mr. Turner and Ms. Andrews were either friends or at least acquaintances; that Ms. Andrews's employment as a payroll technician gave her access to VAMC personnel files; that Ms. Andrews received a $1,000. payment from Mr. Turner after he received the disbursement of FEGLI benefits; and that Ms. Andrews was a public official within the meaning of the bribery statute.

The government's evidence began with stipulations by the parties[3] to its exhibits nos. 1, 5, 12, 18, 22, 30, 31, 34, 35, 35(a), 35(b) and 50. (Tr., pp. 326)  These comprised, respectively, records of (a) the Office of Federal Employees Group Life Insurance ("OFEGLI"); (b) Bank of America relating to an account of Vestor Mayo; (c) Certificate of Death of Vesto Mayo; (d) Dept. of Veterans Affairs official personnel file of Vestor Mayo; (e) Primerica Life Insurance Company relating to Vestor Mayo; (f) Maryland Motor Vehicle Administration; (g) National City Mortgage Company; (g) Federal Credit Union relating to Peter Turner and Latanya Johnson[4], and (h) Citadel Federal Credit Union (three folders of documents). (Tr., p. 327-328)  It admitted many other exhibits in the course of the trial

Witnesses who testified for the government were:

1. *James Lebron.*  He testified he was employed as a human resource specialist at the VA Medical Center. (Tr. 332)  His responsibilities included "benefits counseling, and processing for new employees and existing employees" which embraced processing the

---

[3] Defendant's reference to parties includes the United States, defendant Peter Turner and defendant Latanya Andrews.

[4]Johnson is defendant Andrews's previous surname.

FEGLI life insurance forms for VAMC employees. (Id.)  His office was in a section of the VAMC that adjoined the payroll office in which Ms. Andrews worked.

2. *Lorenza Mayo*.  The mother of Vestor Mayo, she was the default beneficiary of the FEGLI benefits (in the absence of any specific designation by the insured) and who later received a one-half share of the $41,000.00 policy proceeds.

3. *Anthony Polizzi*.  Mr. Polizzi is a claims manager with MetLife, an insurance company that administers the OFEGLI program.

4. *Nancy Cox*.  Ms. Cox is a forensic document examiner at the VA's Office of the Inspector General.

5. *Shantel Robinson*.  Ms. Robinson, the case agent, works as an investigator in the Office of the Inspector General ("OIG") of the Office of Personnel Management ("OPM").

### III.  The Lacunae of the Government's Case

Defendant Andrews has presented in summary fashion the government's case against her.  By presenting what the government failed to show—what the case lacks or omits—defendant hopes to demonstrate that this Court should grant the motion for judgment of acquittal.  Defendant further offers that it her argument is not that the government's case is simply a weak one, but rather that its weakness prevents it from establishing an evidentiary chain that could lead a reasonable juror to conclude guilt.

The indictment alleges that "[b]etween on or about December 8, 2000, and in or about January, 2001, defendant LATANYA ANDREWS *caused* the fraudulent Designation of Beneficiary Form to be placed in V(estor) M(ayo)'s official personnel file located in the human resource office of the DVAMC." (¶18, p. 7)  The government's

evidence failed to prove that Ms. Andrews had contact with the form itself or that she caused its placement personnel file of Vestor Mayo.

(a)  *The Designation of Beneficiary Form*

Government exhibit no. 2 was the designation of beneficiary form of Vestor Mayo.  It was admitted during the testimony of James Lebron. (Tr. 326-327)  The government presented no evidence during the trial showing that Ms. Andrews obtained the form for another person; possessed the form; helped prepare it; forged the signature of either Vestor Mayo[5] or James Lebron, or otherwise was involved with its placement in Vestor Mayo's personnel file.

(b)  *Access and Proximity*

The government proved that, as one of many payroll technicians, Ms. Andrews had access and enjoyed proximity to the personnel files.  But the government did not prove, either through Mr. Lebron's testimony or other evidence, that Ms. Andrews *knew* the location of the personnel files.   On direct examination, the government elicited:

Q.  Would a payroll technician know where the OPFs are located?

A.  I imagine so, yes.

(Tr. 348, lines 21-22)

This is the only known question and answer relating to Ms. Andrews's knowledge of the OPF file room.  Jane Austen might observe that Ms. Andrews's familiarity with the file room was a truth universally acknowledged, but it was hardly established by the evidence.  At no time during the trial did the government present evidence, either in an exhibit or through live testimony, that Ms. Andrews knew the current location of the

---

[5] Nancy Cox concluded that Vestor Mayo did not write the "questioned signatures" on the DOB form (Tr. 606) and that James Lebron "very probably did not write the questioned signature" on that same form. (Tr. 618)  Mr. Lebron earlier testified that he was not the writer of the purported signature. (Tr. 355)

personnel files or how to access them.[6]  There was no evidence of protocols payroll

technicians were expected to follow; instructions they were given upon taking

employment; or testimony about *actual* requests Ms. Andrews made for files or evidence

that she knew where and how she might obtain files.

Mr. Lebron testified that the payroll technicians did not have *authorized* or

*general* access to the file room, but that they could request files, which a human resource

employee would then bring to them. (Tr. 349, 398)   A payroll technician couldn't simply

walk into the file room and retrieve a file. (Tr. 349)  But when a technician sought access

to a file, it was not necessary to fill out a request form (Tr. 398, lines 24-25; 399, line 1)

and no apparent record of the request or viewing.

Q.  It's true…for a payroll technician to actually get access to a folder or materials
in a folder, that payroll technician would have to make a request of someone; correct?

A.:  Correct.

Q.  So materials would be brought out to the payroll technician in the area where
he or she worked.

A.  Right, or allow them to review the OPF.[7]

(Tr. 398, lines 6-12)

Mr. Lebron agreed with the statement that "the file room itself was supposed to be

locked but sometimes wasn't…." (Tr. 397, lines 22-23)  He also agreed that the lockers

which held files were not locked. (Tr. 397-398, lines 25-1)  It was true that the door to the

---

[6]Government exhibit no. 45, admitted during the testimony of Agent Robinson, was Ms. Andrews's
application for federal employment.  A bullet point in the application said that Ms. Andrews was
"[r]esponsible for pulling and filing OPFs in appropriate area." (Tr. 648)  The government did not show,
however, that this area was the one VAMC used for Vester Mayo's OPF.  In fact, the government was
careful not to argue that Ms. Andrews knew the location of the current file room for OPFs; it acknowledged
in closing only that "many years earlier (she) had a job requiring her to pull and file OPFs….At one point
her job was working with the files." (Tr. 918, lines 18-21)

[7] Official Personnel File.

room which contained the files "was supposed to be locked and sometimes was locked[.]" (Tr. 398, lines 3-4)  But if that door was unlocked at the end of the day, "if all the Human Resources' people had gone and Payroll people were still there, then Payroll people could get into that room with the official personnel folders." (Tr. 401, lines 3-7) And no one person had the responsibility to lock the door at the end of the workday. (Id., lines 10-14)  Mr. Lebron said there even were occasions when he arrived at work in the morning and the door to OPF file room was unlocked. (Tr. 410, lines 7-14)

Mr. Lebron testified that he knew defendant Turner as a disabled veteran. (Tr. 350, lines 2-12)  He testified, in effect, that Mr. Turner knew him, too.[8] :  the government presented evidence of statements that Mr. Turner made to Mr. Lebron in August 2003. (Tr. 370-372)  He also identified Mr. Turner in open court. (Tr. 372, lines 17-20)  There was also evidence of Mr. Turner visiting Ms. Andrews on her job.  So the implication of Mr. Lebron's testimony is that any person who remained in the payroll office at the end of the day could get into the file room when the door to the room was unlocked.  That would include Mr. Turner, a habitué of the VAMC.

During normal hours, "a payroll technician (could not) walk into the OPF room. (Tr. 349, lines 16-17).  But the OPF room was not normally "…kept under observation or guard by anyone. (Id., lines 18-19)  If a payroll technician walked into the OPF room, "…one of the HR specialists would probably ask them what they need." (Id., lines 21-24) But when asked what would happen if an HR specialist did *not* see a payroll technician entering the OPF room, Mr. Lebron admitted that "I honestly couldn't say." (Id., line 25;

_____

[8] Mr. Lebron also testified that he wore a tag which identified him as a VA employee. (Tr. 399, lines 13-20)

350, line 1)  Importantly, Mr. Lebron left the general impression of a place with lax

security and the potential for unimpeded access:

> Q.  If there's nobody in Human Resources' still working, would it be possible for there to be people still working in Payroll?
>
> A.  Sure.
>
> Q.  And that happened on occasion?
>
> A.  I imagine it did.
>
> Q.  If no one (on the) Human Resources' staff were still working, would there be anybond to observe if a Payroll person attempted to go into the OPF room?
>
> A.  No.

(Tr. 351, lines 19-25; 352, lines 1-2)

Last, there was no evidence that Ms. Andrews requested the Mayo personnel file;

that she was seen in the file room, either with permission or surreptiously; or that she

admitted to investigators or other persons that she handled the Mayo file or the DOB

form.

> (c)  *Defendant Turner's contacts with defendant Andrews*

The government's evidence showed that Mr. Turner knew each other, had driven

together in Turner's car to the VAMC, and had once visited together at Vestor Mayo's

house.  There was no evidence that defendants conversed about the DOB form or about

efforts to obtain proceeds from Ms. Mayo's FEGLI policy.

> (d)  *Defendant Andrews's receipt of the $1000.00;  her statements to Agent*
> *Robinson*

Through Agent Robinson, the government introduced evidence of Ms. Andrews's

statements.   The government characterized in its closing argument said Ms. Andrews

"tried to conceal seriatum her involvement in this scheme by coming up (with) one

preposterous story after another." These statements included the Ms. Andrews's belated acknowledgment that she had received a $1000. loan for the purchase of a car.

Indeed, Ms. Andrews *did* purchase a car within a month of her receipt of the money from Mr. Turner. Though Agent Robinson sifted through the bank records of Ms. Andrews which failed to show, the agent said, evidence of repayment during the month in which Ms. Andrews received the check, Agent Robinson admitted the records did not show how Ms. Andrews used money from her account or what other funds might have been available to Ms. Andrews during that period. (Tr. 687-690)

Preposterous and implausible the statements may have been, yet they were not admissions of criminal conduct nor confessions to it.[9] It is important to remember this, because they have ambiguous usefulness in helping make the government's case. Likewise the $1000.00 check written by Mr. Turner from the proceeds of the FEGLI policy. The government contended that this was a bribery payment disguised as a loan.[10]

Admissions of criminal conduct are *always* admissions. But denials are by nature equivocal. It is the very *inconclusiveness* of Ms. Andrews's statements that limits their utility.

### IV. THE LACK OF ULTIMATE PROOF

The Court instructed the jury on the elements of the two offenses. (Tr. 985-1001) At base, a conspiracy is an agreement by two or more persons to commit a crime. The agreement "need not be formal, written, or even expressed directly in every detail." (Tr. 993, lines 5-6) But a defendant must know "the purpose or goal of the agreement or

---

[9] The Court, in its final instructions, gave Instruction 2.48 ("Statements of the Defendant – Substantive Evidence") from the standard Criminal Jury Instructions. That instruction applies to any statement of a defendant.

[10] The word "loan" appeared in the memo section of the check.

understanding and deliberately enter[] into the agreement intending, in some way, to accomplish the goal or purpose by this common plan or joint action." (Tr. 994, lines 10-13)  Finally, once there is a criminal agreement, at least one of the parties to the agreement must perform an overt act during the conspiracy, designed to further the goals of the conspiracy. (Tr. 995)

The government's evidence is consistent with Peter Turner himself having commandeered the designation of beneficiary form; falsely prepared it; placed it in Vestor Mayo's personnel file and profited from its payment.   The payment of $1000.00 to Ms. Andrews, though suspicious, is no more *than* suspicious.

In the circumstances this case presents, if the government's proof fails to establish conspiracy, it must necessarily fail to establish bribery.  The bribery must be viewed as the means by which the conspirators carried out the conspiracy, and if the conspiracy falls, too the bribery must fall.

### V.  CONCLUSION

Defendant recognizes that "[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation[11] of circumstances'." *Glasser v. United States,* 315 U.S. 60, 80 (1942) (citations omitted).  But the manner of proof can't be allowed to relax the *standard* of proof.  The collocation of circumstances in this case falls short of the proof our system requires—namely, proof beyond a reasonable doubt.  The Court should grant defendant's motion for judgment of acquittal.

WHEREFORE, defendant moves the Court to grant said relief.

---

[11] "[T]he act or result of placing or arranging together." *Merriam-Webster's Collegiate Dictionary,* (11th ed. 2003)

Respectfully submitted,


NATHAN I. SILVER
Attorney for Latanya Andrews
Unified Bar No. 944314
P.O. Box 5757
Bethesda MD 20824-5757
(301) 229-0189 (voice & fax)
email: NISquire@aol.com

*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served via electronic mail upon Ann Brickley, Esq. and Daniel A. Petalas, Esq., Public Integrity Section, Criminal Division, U.S. Dept. of Justice, Washington, D.C., and upon James W. Rudasill, Jr., Esq., attorney for codefendant Peter Turner, this 12th day of September, 2006.


_____

*Nathan I. Silver*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America_____
                                                    )         Crim. No. 06-0026-02 (CKK)
                                                    )
                    versus                          )
                                                    )
LATANYA ANDREWS,                                    )
_____Defendant_____  )

ORDER

It appearing from good cause shown in defendant's Motion for Directed Verdict

Pursuant to F.R.Crim.P. 29(b) and (c), and from other evidence before the Court in the

record of this case, it shall be and hereby is,

ORDERED, this _____ day of _____, 2006, that defendant's

Motion for Judgment of Acquittal on both counts I and II of the Indictment is

GRANTED.

                                        _____
                                        Hon. Colleen Kollar-Kotelly
                                        United States District Judge

cc:    Nathan I. Silver, Esq.
       P.O. Box 5757
       Bethesda, MD 20824

       Ann Brickley, Esq.
       Daniel A. Petalas, Esq.
       U.S. Department of Justice – Criminal Division
       Public Integrity Section
       1400 New York Ave. NW
       Washington, D.C. 20005

       James W. Rudasill, Jr., Esq.
       717 D Street NW
       Washington, D.C. 20004

13