# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 16, 2007          Decided July 15, 2008

No. 07-3024

UNITED STATES OF AMERICA,
APPELLEE

v.

LATANYA ANDREWS,
APPELLANT

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUL 1 5 2008

CLERK

Appeal from the United States District Court
for the District of Columbia
(No. 06cr00026-02)

———

FILED

SEP - 9 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*Ryan M. Malone* argued the cause for appellant. With him
on the briefs was *Peter M. Brody*, appointed by the court.

*Daniel A. Petalas*, Attorney, U.S. Department of Justice,
argued the cause and filed the brief for appellee. *Roy W.
McLeese, III*, Assistant U.S. Attorney, entered an appearance.

Before:  ROGERS and GARLAND, *Circuit Judges*, and
SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

Concurring opinion filed by *Circuit Judge* ROGERS.

2

GARLAND, *Circuit Judge*:  LaTanya Andrews appeals her conviction for bribery and conspiracy to defraud the United States on the ground that the government failed to disclose exculpatory evidence to her in a timely fashion, in violation of her rights under *Brady v. Maryland*, 373 U.S. 83 (1963).  She also appeals her sentence on the ground that the district court applied the wrong edition of the United States Sentencing Guidelines Manual, and in so doing violated the Ex Post Facto Clause of the Constitution.  Because we find no *Brady* violation, and conclude that any error the court made in referring to the 2006 Guidelines Manual was not plain, we affirm the judgment of the district court.

I

LaTanya Andrews worked at the Department of Veterans Affairs Medical Center (DVAMC) for eighteen years, beginning in 1988.  In 2000, Andrews worked in the DVAMC's payroll section as a payroll technician.  That section was located in the same area as the human resources section -- the department charged with storing official personnel folders, including those pertaining to employee benefits -- in which Andrews had worked earlier in her career.  Andrews' codefendant, Peter Turner, worked at the DVAMC as a volunteer driver.

From 1998 to 2000, Turner was romantically involved with Vestor Mayo, a DVAMC nurse with whom he and Andrews sometimes commuted to work.  Mayo suffered a stroke on December 8, 2000, and she died two weeks later.  At the time of her death, Mayo was insured through the Federal Employees' Group Life Insurance (FEGLI) program, which is administered through the Office of Federal Employees' Group Life Insurance (OFEGLI).  The designation-of-beneficiary form received by OFEGLI in January 2001 listed Turner and Mayo's mother, Lorenza Mayo, as co-beneficiaries.  Pursuant to that designation,

3

OFEGLI distributed $20,562.90 to each beneficiary as money market accounts on which they could draw checks. On February 1, 2001, Turner wrote Andrews a check from his beneficiary account for $1,000. It was the first check that Turner wrote from that account; the memorandum line stated that the money was a loan. In March 2001, Andrews purchased a car for $800.

When Lorenza Mayo went to the DVAMC human resources section to review the paperwork necessary to obtain her share of her daughter's insurance proceeds, she examined the designation-of-beneficiary form and concluded that it was a forgery: the handwriting and signature did not look like those of her daughter, the Social Security number was incorrect, and Lorenza's name and address were misspelled. Lorenza and her husband reported the forgery to OFEGLI, which in turn forwarded the claim to the Office of Personnel Management (OPM) for review.

In November 2005, Andrews submitted to a voluntary interview by Special Agents Shantel Robinson and Derek Holt of OPM's Office of Inspector General. When asked whether she had ever received money or a loan from Turner, Andrews said he had never given her anything more than $10. When confronted with the $1,000 check that he had written to her, she changed her story, ultimately claiming that it was a loan. The agents recorded Andrews' statements in the handwritten notes they took during the interview and in Robinson's typewritten report prepared the same day.

On January 31, 2006, Andrews and Turner were indicted and charged with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and one count of bribery, in violation of 18 U.S.C. § 201(b). The indictment alleged that Turner and Andrews conspired to defraud the United States and that Turner paid Andrews $1,000 for assisting him in placing the

4

forged beneficiary form in the file. The indictment also charged that Andrews and Turner agreed to conceal the conspiracy and any acts committed in furtherance thereof.

On July 31, 2006, after a four-day trial, a jury returned guilty verdicts against Andrews and Turner on both the conspiracy and bribery charges. On February 9, 2007, the district court sentenced Andrews to concurrent 15-month terms of imprisonment. In so doing, the court applied the then-effective 2006 United States Sentencing Guidelines Manual in an advisory fashion, as required by *United States v. Booker*, 543 U.S. 220, 245 (2005).

Andrews challenges the judgment below on two principal grounds: (1) that the government violated her rights under *Brady v. Maryland*, 373 U.S. 83, by failing to produce Special Agents Robinson's and Holt's handwritten interview notes prior to trial; and (2) that the district court erred under the U.S. Sentencing Guidelines and the Constitution's Ex Post Facto Clause by calculating her sentence based on the 2006 Sentencing Guidelines Manual, rather than on the Manual that was in effect in February 2001 -- the month she contends the conspiracy ended. We consider these challenges below.[1]

_____

[1]Andrews also contends that the evidence at trial was insufficient to support her conviction, although she concedes that it was enough to sustain Turner's. Mot. for Directed Verdict at 11 (Sept. 12, 2006). Our standard for reviewing such a challenge is narrow: we must accept the jury's guilty verdict if we conclude that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted). "In making that determination, 'the prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.'" *United*

5

II

We begin with Andrews' claim under *Brady v. Maryland.*

A

In pretrial hearings, the district court ordered the government to produce, inter alia, all *Brady* materials prior to trial.[2] On February 16, 2006, the government produced 3,134 pages of documents and records as part of its pretrial discovery. Under separate cover, it also turned over Robinson's typewritten interview report, which conveyed the substance of Andrews' answers and noted Holt's presence during the interview. Before trial, the government represented to the court that it had complied with the court's production order.

At trial, Agent Robinson testified about her November 2005 interview with Andrews. Robinson stated that Andrews initially told her and Agent Holt that she had never borrowed or received

---

*States v. Branham*, 515 F.3d 1268, 1273 (D.C. Cir. 2008) (quoting *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005)). In this case, the government's evidence showed that the signatures on the designation-of-beneficiary form were forgeries, that the physical location of Andrews' workstation gave her access to the DVAMC's personnel files, that the first check Turner wrote from the fraudulently-obtained life insurance disbursement was to Andrews for $1,000, and that Andrews lied to the OPM agents when they asked whether she had ever received money or loans from Turner. This evidence is sufficient to survive our narrow standard of review.

[2]The court also ordered the government to produce all documents required by Federal Rule of Criminal Procedure 16 and all witness statements subject to disclosure under the Jencks Act, 18 U.S.C. § 3500(b). The defendant does not assert a Rule 16 or Jencks Act violation on appeal.

6

more than $10 from Turner.  Trial Tr. 651 (July 26, 2006).
When Robinson showed Andrews a copy of the $1,000 check,
Andrews changed her story, claiming that Turner had given her
the check so that she could prove to a car dealership that she had
a checking account.  *Id.*  When Robinson pointed out that a
check written from *Turner's* beneficiary account would not
show that *Andrews* had a checking account, Andrews changed
her story again, claiming that she borrowed the money from
Turner in order to purchase a car.  *Id.* at 653.  According to
Robinson, Andrews also said that she had repaid Turner in
February 2001 and that her bank statements should reflect that
fact.  *Id.*  Robinson recounted that she checked Andrews' bank
accounts and did not find such a payment, although there were
regular cash withdrawals.  *Id.* at 654, 658.  Finally, she testified
that documents showed Andrews purchased a car in March
2001, after the period in which she claimed she had repaid
Turner for the loan.  *Id.* at 655.

On cross-examination, at the end of the trial day, defense
counsel asked Robinson whether her testimony was based on her
memory of the interview.  Robinson answered that it was also
based on her interview report and on the handwritten notes that
she took during the interview.  *Id.* at 678-79.  Defense counsel
had not known of the notes' existence prior to that point and,
upon making this discovery, asked to approach the bench.  The
prosecutor asserted that the government had no obligation to
produce the notes because they were incorporated into
Robinson's final report, but she conceded that she had not
actually seen them.  The court instructed the government to
examine the notes overnight and to determine whether they
should be produced.  *Id.* at 680.  Andrews' counsel opted to
continue his cross-examination of Robinson without the notes.
*Id.*  After the cross-examination ended, the court adjourned trial
for the day.

7

The following morning, the government advised the court that, although it still believed it had no obligation to produce Robinson's handwritten notes, it had voluntarily done so "in an abundance of caution." Trial Tr. 717-18 (July 27, 2006). The court then asked defense counsel whether there was "anything in [the notes] that requires any further inquiry." *Id.* at 718. Counsel said that further cross-examination was unnecessary, but he reserved the right to use the notes in the event that the government re-called Robinson on rebuttal. *Id.* The government did not re-call her, and defense counsel did not raise the issue again.

B

In *Brady v. Maryland*, the Supreme Court held that the Due Process Clause imposes upon the prosecution an obligation to disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *Giglio v. United States* and *United States v. Bagley*, the Court held that "[i]mpeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio*, 405 U.S. 150, 154 (1972)). As we have noted, "courts have used the term '*Brady* violation' to cover a multitude of prosecutorial sins involving breach of 'the broad obligation to disclose exculpatory evidence,' often called '*Brady* material.'" *In re Sealed Case*, 185 F.3d 887, 892 (D.C. Cir. 1999) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). "These include both the failure to search for *Brady* material and the failure to produce it." *Id.*

In *Strickler v. Greene*, the Supreme Court explained that, "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced

8

a different verdict." 527 U.S. at 281. A "true *Brady* violation" has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281-82. To satisfy the prejudice component, the withheld evidence must be "material" -- that is, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *Bagley*, 473 U.S. at 682); *see Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). If the undisclosed evidence is material, a new trial is required. *See Kyles*, 514 U.S. at 421-22.

Andrews argues that Robinson's and Holt's handwritten notes are *Brady* or *Giglio* material because they do not contain two of the four allegedly false statements that Robinson testified Andrews made to her. The notes do reflect Andrews' first statement: that Turner had never given or loaned her anything more than $10. After Robinson confronted Andrews with the $1,000 check from Turner, Robinson testified that Andrews made a second statement: "that she needed to show a car dealership that she had a checking account and so she asked Mr. Turner to write her the check." Trial Tr. 651 (July 26, 2006). Andrews maintains that this second statement is not included in the notes. She concedes that the third statement recounted by Robinson -- that Andrews said Turner loaned her the money so that she could purchase a car -- is in the notes. But she points out that the alleged fourth statement -- that she told Robinson that "her bank statements in February of 2001 should reflect that she paid Mr. Turner back" -- is not there. *Id.* at 653.

Andrews contends that the absence in the notes of a mention of her alleged second statement "is a critical difference from Robinson's report and testimony because the second story is the

9

most suspicious and was highlighted by the Government as proof of Andrews's guilt." Appellant's Br. 18 (citing Trial Tr. 901 (July 28, 2006)). She also regards the absence of any reference to her alleged fourth statement as significant. Had the notes been available to defense counsel before he began his cross-examination, Andrews asserts, he could have successfully impeached Robinson's testimony and changed the outcome of the trial.

Contrary to the government's contention in the district court, "[i]t seems too plain for argument that rough notes from any witness interview could prove to be *Brady* material." *United States v. Harrison*, 524 F.2d 421, 427 (D.C. Cir. 1975). As we have previously explained, the "possible importance of the rough notes" for the purpose of providing leads or of impeaching a witness for discrepancies between the notes and the witness' testimony "is not diminished in cases where" the notes form the basis of a final report that the prosecution turns over to the defense. *Id.* Nor is the prosecutor relieved of her *Brady* obligation if the notes are kept by the agent and never reviewed by the prosecutor. As the Court held in *Kyles v. Whitley*, the *Brady* rule includes evidence "known only to police investigators and not to the prosecutor." 514 U.S. at 438. "Hence, to comply with *Brady*, 'the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.'" *In re Sealed Case*, 185 F.3d at 892 (quoting *Kyles*, 514 U.S. at 437).

The government's first argument on appeal is considerably stronger than the one it made in the district court. The government asserts that the differences between the notes and Robinson's report and testimony are not sufficient to satisfy the prejudice prong of the *Strickler* test. Parsing the words of Robinson's handwritten notes, the government contends that

they can be construed as referring to Andrews' second statement as well as to her first and third. But even if that were not true, the government maintains that the notes would not have successfully impeached Robinson because she could easily have explained that rough interview notes are by their nature incomplete, and that the report -- completed on the same day as the interview -- was an accurate recounting of what Andrews had said. Moreover, the notes *do* reflect the first story recounted by Agent Robinson -- that Andrews' responded to the question of whether Turner had ever given or loaned her anything by stating that he had never given or loaned her anything greater than $10. Nor is there any dispute that this story was a lie, which Andrews did not withdraw until confronted with the $1,000 check. All of this makes it hard for us to conclude that there is "a reasonable probability that, had the [notes] been disclosed to the defense, the result of the proceeding would have been different." *In re Sealed Case*, 185 F.3d at 892 (quoting *Bagley*, 473 U.S. at 676).

The government's second argument on appeal is even stronger, and there is no doubt that it is dispositive. Even if the difference between the notes and Robinson's testimony were material, the notes were in fact "disclosed to the defense." *Id.* It is true that the government did not provide them until late in the day. But in such circumstances, where disclosure was made but made late, "the defendant must show a reasonable probability that an earlier disclosure would have changed the trial's result" and not just that the evidence was material. *United States v. Dean*, 55 F.3d 640, 663 (D.C. Cir. 1995); *see also United States v. Wilson*, 160 F.3d 732, 742 (D.C. Cir. 1998) ("Appellants have the burden to show that 'had the statements been disclosed earlier, there is a probability sufficient to undermine our confidence in the actual outcome that the jury would have acquitted.'" (quoting *United States v. Tarantino*, 846 F.2d 1384, 1417 (D.C. Cir. 1988))). And as we have said

before, "a new trial is rarely warranted based on a *Brady* claim where the defendant[] obtained the information in time to make use of it." *Wilson*, 160 F.3d at 742.

Andrews contends that the government's failure to produce the notes "until the morning of the fourth day of trial (immediately before the defense case was to begin) did not leave defense counsel with enough time to use the material properly, to build a responsive defense theory, or effectively impeach Robinson, who would have to have been recalled." Appellant's Br. 23.[3]  The notes, however, were hardly voluminous: Robinson's and Holt's notes together comprised only six pages of large, legible handwriting.  *See* J.A. 143-48.  Moreover, defense counsel had two opportunities to request a continuance to examine them.  The first was during the bench conference immediately following counsel's discovery of the notes' existence on the afternoon of Wednesday, July 26, 2006; the second was on the morning of Thursday, July 27, 2006, after the government had produced the notes to counsel and he had read them.  As in *Wilson*, a case in which we rejected a *Brady* claim

_____

[3] Andrews' appellate brief also states that her trial counsel "could not recall if the Government provided him with a copy of Agent Holt's notes at the same time as Robinson's notes, or whether he received them at a later time." Appellant's Br. 11 n.3.  But because the burden of showing a *Brady* violation -- including one caused by late disclosure -- is on the defendant, the speculative possibility that the Holt notes came later adds nothing to Andrews' argument.  Andrews further maintains that, if her trial counsel had received the notes earlier, he "could have called Holt as a witness and used his notes to discredit Robinson's testimony." *Id.* at 23.  Yet counsel declined two opportunities to seek a continuance, during which he could have received and evaluated the notes and then decided whether to call Holt.  We thus have no ground for finding that testimony by Holt -- whose notes were not materially different from Robinson's -- would have made a difference in the outcome of the trial.

12

similarly based on tardy disclosure, Andrews' counsel "did not request a continuance in order to determine whether the statements supported a viable alternative defense, nor request a mistrial, nor even claim a *Brady* violation had occurred." 160 F.3d at 741.

Andrews maintains that her counsel had little choice but to decline the opportunity to delay the cross-examination on Wednesday and use the notes on Thursday morning, as that would have required recalling Robinson -- a strong prosecution witness -- to the stand. But cross-examinations often run over two days, and lawyers often save their best ammunition for their last exchanges with a witness. Andrews has suggested no reason why -- if the inconsistencies between the notes and Robinson's testimony were as powerful as she believes they were -- concluding the examination by confronting the witness on Thursday morning would have been tactically disadvantageous. Accordingly, because Andrews has failed to show that she did not receive the notes "in time to make effective use" of them, we reject her *Brady* challenge. *Dean,* 55 F.3d at 663 (internal quotation marks omitted).

III

We next address Andrews' sentencing challenge, which is based on her contention that the district court referred to the wrong edition of the Sentencing Guidelines Manual, in violation of Guidelines § 1B1.11 and the Ex Post Facto Clause. Because Andrews did not object to the court's application of the 2006 Manual in the district court, we review her claim only for plain error. *United States v. Simpson,* 430 F.3d 1177, 1183 (D.C. Cir. 2005).[4]  Under that standard: "'[T]here must be (1) error, (2)

_____

[4] Andrews contends that she effectively raised this claim in the district court by arguing, before trial began, that the indictment was

13

that is plain, and (3) that affect[s] substantial rights. If all three
conditions are met, an appellate court may then exercise its
discretion to notice a forfeited error, but only if (4) the error
seriously affect[s] the fairness, integrity, or public reputation of
judicial proceedings.'" *Id.* (alterations in original) (quoting
*Johnson v. United States,* 520 U.S. 461, 467 (1997)).

The Sentencing Guidelines provide that courts should
generally "use the Guidelines Manual in effect on the date that
the defendant is sentenced." U.S. Sentencing Guidelines
Manual § 1B1.11(a) (2006) [hereinafter U.S.S.G.]. Andrews
was sentenced on February 9, 2007, when the 2006 Manual was
in effect. The Guidelines also provide, however, that "[i]f the
court determines that use of the Guidelines Manual in effect on
the date that the defendant is sentenced would violate the *ex post
facto* clause of the United States Constitution, the court shall use
the Guidelines Manual in effect on the date that the offense of
conviction was committed." *Id.* § 1B1.11(b)(1). We have
previously held that, when use of a later Manual would
"adversely affect" a defendant's sentence, it "may not be applied
retroactively without violating the *ex post facto* clause." *United
States v. Lam Kwong-Wah,* 924 F.2d 298, 304 (D.C. Cir. 1991);
*see United States v. Gaviria,* 116 F.3d 1498, 1514 (D.C. Cir.
1997). Hence, as recently as 2003 we held that "courts must
apply the Guidelines in effect on the date the offense was
committed if using the Guidelines in effect at the time of

---

barred by the statute of limitations because the alleged conspiracy
ended no later than February 2001. This was insufficient to preserve
the objection she has made on appeal, however, because she never
suggested, at sentencing or otherwise, that the court should apply the
2000 rather than 2006 Guidelines Manual. *See In re Sealed Case,* 349
F.3d 685, 690-91 (D.C. Cir. 2003); *United States v. Smith,* 232 F.3d
236, 238 (D.C. Cir. 2000).

14

sentencing would yield a longer sentence." *United States v. Bolla*, 346 F.3d 1148, 1151 n.1 (D.C. Cir. 2003).

Andrews contends that the charged conspiracy ended in February 2001 and notes that the Guidelines Manual in effect in that month was the 2000 Manual. The district court's use of the 2006 Manual was error, she argues, because it yielded a longer sentence than that indicated by the 2000 Manual. The 2006 Guidelines Manual specifies a base offense level of 14 for Andrews' conspiracy and bribery convictions. U.S.S.G. § 2C1.1(a)(1) (2006). Given Andrews' criminal history category of I, that offense level corresponds to a sentence of 15 to 21 months. *Id.* § 5A. In contrast, the 2000 Guidelines Manual specifies a base offense level of 10 for Andrews' offenses of conviction, U.S.S.G. § 2C1.1(a)(1) (2000), which, given her criminal history category, corresponds to a sentence of only 6 to 12 months, *id.* § 5A.

The government argues that, even if the district court erred in applying the 2006 Manual, that error was not plain for two reasons. We agree.

First, in its 2005 opinion in *United States v. Booker*, the Supreme Court held that the Sentencing Guidelines must now be regarded as advisory rather than mandatory. 543 U.S. at 245. This circuit has not yet determined whether, after *Booker*, application of a later (than the date-of-offense) Guidelines Manual that yields a higher sentence continues to raise an ex post facto problem. Nor has the Supreme Court. The Seventh Circuit has concluded that use of a later Manual no longer presents such a problem, holding that "the ex post facto clause should apply only to laws and regulations that bind rather than advise." *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006). Some other courts have indicated their agreement. *See United States v. Mathis*, 239 F. App'x 513, 517 n.2 (11th Cir.

15

2007); *United States v. Barton*, 455 F.3d 649, 655 n.4 (6th Cir. 2006); *see also United States v. Rodarte-Vasquez*, 488 F.3d 316, 325 (5th Cir. 2007) (Jones, C.J., concurring). The Eighth Circuit, however, disagrees. *See United States v. Carter*, 490 F.3d 641, 643 (8th Cir. 2007). And several other circuits also appear to regard the ex post facto analysis as unchanged, continuing to apply Guidelines § 1B1.11(b)(1) in the same way they did before *Booker*. *See United States v. Gilman*, 478 F.3d 440, 449 (1st Cir. 2007); *United States v. Wood*, 486 F.3d 781, 791 (3d Cir. 2007); *United States v. Austin*, 479 F.3d 363, 367 (5th Cir. 2007); *United States v. Stevens*, 462 F.3d 1169, 1170 (9th Cir. 2006).

We do not need to decide which side of that circuit split we would join in order to resolve this case. "Even assuming the district court erred, . . . absent an opinion by this circuit or the Supreme Court on the issue in dispute, there is no plain error unless [the] district court failed to follow [an] 'absolutely clear' legal norm . . . ." *United States v. Vizcaino*, 202 F.3d 345, 348 (D.C. Cir. 2000) (quoting *United States v. Merlos*, 8 F.3d 48, 51 (D.C. Cir. 1993)). And there is no such absolutely clear norm here.

Second, it is also not plain that Andrews' conspiracy ended in February 2001 -- when Andrews received the $1,000 payment from Turner -- rather than in 2005 -- when Andrews lied to OPM investigators to conceal the plot. Andrews' argument in favor of the former date is based on *Grunewald v. United States*, which held that "acts of concealment done after the[] central objectives have been attained, for the purpose only of covering up after the crime," are not part of the principal conspiracy. 353 U.S. 391, 405 (1957); *see Pyramid Sec., Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117-18 (D.C. Cir. 1991). This, Andrews argues, means that the conspiracy ended when she says it did: with her receipt of the $1,000. But there is an exception to the

16

*Grunewald* rule.  As the Supreme Court explained, "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy," which extend the statute of limitations, "and acts of concealment done after these central objectives have been attained," which do not.  *Grunewald*, 353 U.S. at 405.  When "'[t]he successful accomplishment of the crime necessitates concealment,' acts of concealment are properly considered to be within the scope of the original conspiracy."  *United States v. Gleason*, 766 F.2d 1239, 1242 (8th Cir. 1985) (quoting *Grunewald*, 353 U.S. at 405).  In *Forman v. United States*, the Court applied this exception to hold that a conspiracy to evade income taxes extended to false statements made to IRS agents as late as 1953, notwithstanding that the last fraudulent return was filed in 1946, because "concealment of the 'holdout' income must continue if the evasion is to succeed.  It must continue until action thereon is barred and the evasion permanently effected."  361 U.S. 416, 424 (1960), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978).

The government asserts that *Forman*, not *Grunewald*, governs here.  It argues that, after the insurance proceeds were initially distributed pursuant to the designation-of-beneficiary form, OPM had a continuing obligation to ensure that the money had been given to the correct beneficiary.  Thus, the conspirators' "object to defraud continued throughout the course of the regulatory inquiry conducted by OPM to determine who was the proper lawful beneficiary for those funds," an effort that "remained on-going when Andrews was interviewed in November 2005." Gov't Br. 33.  This, the government argues, is consistent with the language of the indictment, which charged a conspiracy from December 8, 2000, through January 10, 2006, to "defraud the United States by impairing, impeding, and defeating the lawful functions and duties of the OPM and the FEGLI program," Indictment at 3 (J.A. 22), and which listed

17

"conceal[ing] the conspiracy itself and the acts committed in furtherance thereof" among the objects of the conspiracy, *id.* at 5 (J.A. 24).

Once again, we need not decide which party's argument is correct. On its face, the indictment alleged that the conspiracy continued into 2006, and the question of whether *Grunewald* or *Forman* applies to acts of concealment in a particular case is not without difficulty. *See, e.g., United States v. Rabinowitz,* 56 F.3d 932, 933-34 (8th Cir. 1995) (holding that a conspiracy to defraud a client by using a wire transfer included the defendant's subsequent lies to a revenue agent to conceal the nature of those transfers); *United States v. Masters,* 924 F.2d 1362, 1368 (7th Cir. 1991) (holding that a conspiracy to commit murder continued as long as the defendant acted to conceal it where the conspirators, including two police officers, "intended from the first to exert strenuous efforts to prevent discovery of the crime and of their involvement in it"); *Gleason,* 766 F.2d at 1242 (noting "agree[ment] with other courts that have held that a conspiracy covered by 18 U.S.C. § 371, such as the one charged here [to obstruct the collection of income taxes], necessarily contemplates acts of concealment to accomplish its objectives"); *United States v. Diez,* 515 F.2d 892, 897-98 (5th Cir. 1975) (holding that, in "light of the substantial possibility" that the fraudulent tax returns filed by the defendants "would be audited and investigated, the filing of the returns did not fully accomplish the purpose of the main conspiracy"). Given this uncertainty, together with the uncertainty that *Booker* creates for the ex post facto analysis, we cannot conclude that any error in the application of the 2006 Guidelines Manual was plain.

18

IV

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

ROGERS, *Circuit Judge*, concurring. Although I agree that the judgment of conviction must be affirmed, I would hold that Andrews has failed to show plain error with respect to her *Brady* challenge and, without joining unnecessary discussion of the termination date of the conspiracy, with respect to the district court's application of the 2006 edition of the Sentencing Guidelines.

## I.

I agree that the notes at issue constituted *Brady* material, Op. at 9, which the prosecutor was required to turn over to defense counsel prior to trial pursuant to the district court's order and long-established precedent, *see, e.g.*, *United States v. Harrison*, 524 F.2d 421, 427 (D.C. Cir. 1975). The failure to do so is particularly troubling because the prosecutor knew of the notes prior to Andrews' defense counsel's accidental discovery of their existence while cross-examining Agent Robinson at trial. Trial Tr. 679-80 (July 26, 2006). I do not agree, however, that production of the notes was nonetheless timely. Op. at 12. *Brady* requires early enough disclosure that a defendant can make meaningful use of material. *Cf. United States v. Wilson*, 160 F.3d 732, 742 (D.C. Cir. 1998); *United States v. Dean*, 55 F.3d 640, 663 (D.C. Cir. 1995). Contrary to the court's view, it seems highly implausible to suggest that defense counsel could have restructured his defense to save the best for last, Op. at 12, or more generally that a defense trial strategy, any more than a prosecution trial strategy, can be effectively reworked four days into trial, at the close of the government's case, *cf.* Op. at 11-12. The prosecution's tardy disclosure forced Andrews' counsel to choose between recalling a strong government witness after a mid-trial continuance and risk cementing her testimony more firmly in the mind of the jury, or not impeaching the witness at all. Whatever the merits of defense counsel's effort to navigate a middle course, stating that the defense would not recall Agent Robinson as its witness but ensuring that the notes would be

2

available for impeachment if the government did, Trial Tr. 718 (July 27, 2006), it was a strategic decision forced by the prosecutor's delay.  So understood, the defense case was compromised, no matter the "tactics" Andrews' counsel deployed following his receipt of the notes.[1]

The significance of the prosecutor's delay in producing the notes is manifest.   Agent Robinson's testimony was an important part of the government's case, which was not overwhelming to begin with, because her description of the interview with Andrews tied together a set of otherwise circumstantial facts.  Recognizing this, the prosecutor focused on the interview during closing argument, telling the jury that Andrews attempted to "conceal . . . her involvement . . . by coming up [with] one preposterous story after another," Trial Tr. 900 (July 28, 2006), using Agent Robinson's testimony to color and frame facts that could otherwise be excused as a series of innocent coincidences.  While it is true that Agent Robinson's notes corroborate some of her damaging testimony, *see* Op. at 10, they omit any mention of two of the "preposterous stor[ies]" relied on by the prosecutor at closing, specifically that Andrews had stated she wanted to use the check to prove possession of a checking account; and that Andrews claimed to have repaid Turner in February 2001.[2]  Although alerting the jury to these omissions would not constitute a knock-out blow, it is at least

_____

[1]   Exactly how Agent Robinson might have explained the omissions, and how the jury would have assessed any such explanation, are hypotheticals to which the government responds with mere speculation. See Op. at 9-10.

[2]   Although the government suggests the notes can be construed as referring to using a check to prove possession of a checking account, Op. at 9-10; Resp. Br. at 17, one searches the notes in vain for such a reference.

3

plausible that the jurors' confidence in Agent Robinson's memory and veracity would have been undermined. Under these circumstances, earlier disclosure of the notes could have allowed a different, more effective defense strategy and their tardy handover "'undermine[s] confidence in the outcome'" of the trial, *Dean*, 55 F.3d at 663 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)), and thus constitutes a *Brady* violation.

Unfortunately for Andrews, her burden is greater than simply showing a "reasonable probability" of a different verdict, *Strickler v. Greene*, 527 U.S. 263, 280 (1999); because no objection to the delayed handover was made in the district court, Op. at 12, she must now show plain error, *see United States v. Johnson*, 437 F.3d 69, 74 (D.C. Cir. 2006), which she cannot do. In particular, Andrews cannot show that the *Brady* violation affected her "substantial rights." *Id.* Under this part of the plain error test, "the burden on prejudice is reversed, requiring the defendant to show the error's likely effect on the verdict." *United States v. Wilson*, 240 F.3d 39, 45 (D.C. Cir. 2001), citing *United States v. Olano*, 507 U.S. 725, 734 (1993). The government presented significant circumstantial evidence tying Andrews to the charged crimes. This included her ample opportunities to access human resources files; her possession of the knowledge necessary to insert a forged FEGLI form in Mayo's file; Turner's payment of $1,000 to her in the form of a check soon after he received his share of Mayo's life insurance; and the unchanging nature of her bank withdrawal habits in the month she claimed to have repaid Turner. *See* Trial Tr. at 346-51; 647-48; 650-51; 656-58 (July 25-26, 2006). To conclude that the verdict would likely have been different, the court must assume that in addition to the circumstantial evidence, Agent Robinson's testimony was necessary to the guilty verdict and that impeachment of her on the basis of her notes would have been sufficient to alter the verdict. While there is a reasonable

4

probability that timely disclosure of the notes could have led to a different verdict, the impact of such disclosure is too uncertain for Andrews to demonstrate that the verdict would *likely* have been different.[3]

## II.

With regards the *ex post facto* challenge to the sentence, I would rely only upon the first basis the court identifies for holding that the error was not plain, Op. at 14-15, and do not join the dictum discussing the application of *Grunewald v. United States*, 353 U.S. 391 (1957), and *Foreman v. United States*, 361 U.S. 416 (1960), Op. at 15-17. Because the error by the district court in using the 2006 edition of the Guidelines was neither "'clear'" nor "'obvious,'" *United States v. Sumlin*, 271 F.3d 274, 281 (D.C. Cir. 2001) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)),[4] the court need not opine that the date that the conspiracy terminated is legally "uncertain[]," Op. at 17.

---

[3] For the reasons stated by the court, Op. 4 n.1, there was sufficient evidence to support Andrews' convictions for conspiracy and bribery.

[4] Because Andrews did not make this objection in the district court, our review is limited to plain error. *See Johnson*, 437 F.3d at 74.